HARRELL, J., dissenting, in which GREENE, J., joins.
With respect, I dissent.
The Majority opinion claims to be applying the plain meaning of the relevant statutory scheme (“We arrive at this conclusion through an examination of the plain language of the relevant statutes.” Maj. op. at 69, 124 A.3d at 196) and turns to legislative history only to ratify the conclusion reached by its plain meaning analysis (“Although the plain language of the relevant statutes is unambiguous and our analysis could end at this point, we nonetheless note that our holding is reinforced by the legislative history and purpose of the State surcharge provision.” Maj. op. at 73, 124 A.3d at 198). I see the *78 structure of the appropriate analysis a little differently. I submit that the statutory scheme is ambiguous and resort to legislative history is both necessary and dispositive. As the Majority opinion concedes necessarily, “TP § 13-303 provides in separate subsections for the base tax rate and the State surcharge, and states in TP § 13—303(d) that the State surcharge is ‘in addition to the tax imposed under this section[.]’ ” Maj. op. at 71, 124 A.3d at 197. That alone appears to me to be an ambiguity in the statutory scheme, frustrating a plain meaning approach to statutory interpretation and forcing recourse to traditional extrinsic aids in meeting the challenge of interpreting the somewhat complex regulatory provisions.
Turning to the Majority opinion’s analysis of the legislative history of Senate Bill (S.B.) 662 of 2008 (the key enactment), the Majority contends that “the purpose of the 25% State surcharge was wholly unrelated to the County’s farmland transfer tax and was intended to generate State tax revenue without interfering with the counties’ share of the State agricultural land transfer tax ...” (Maj. Op. at 74,124 A.3d at 199). Continuing, the Majority opinion professes not to be “persuaded that inclusion of the State surcharge in the total rate of tax results in a loss of revenue to the County.” Maj. Op. at 75, 124 A.3d at 200 (footnote omitted). I may not grasp completely the Majority’s reasoning (and for that, I apologize), but, if that were the case, how is it then that the result reached by the Majority opinion (in construing the surcharge as part of the tax rate and applying the tax ceiling provision) is that the County is ordered to refund to Phillips $41,468 it had collected from Phillips, in accordance with the way the State and County had applied the regulatory scheme since 2008? Clearly, the County is losing revenue it would have received, but for S.B. 662 and how the Majority interprets the calculation of the tax rates and ceiling. As the Tax Court paraphrased Phillip’s argument, “[b]y adding the State surcharge to the State agricultural transfer tax, the rate of the County farmland transfer tax will be reduced and the amount of County farmland tax the County receives is reduced by the amount of the surcharge.” Tax Court Memorandum And *79 Order at 3. Although it could be seen as an “apples and oranges” analysis, I see it has sleight-of-hand that injures the County in a way not intended by the Legislature.
If the Majority’s view that S.B. 662 (in combination with the pre-existing tax rate and ceiling provision) was not intended to diminish the County’s share of the tax revenue in these circumstances, why did Senator Middleton (Sponsor of S.B. 662) state, seemingly that the bill was to “leav[e] unaltered” otherwise the status quo? Maj. op. at 74, n. 4, 124 A.3d at 199, n. 4. The State desired greater revenue, but not at the County’s expense.
The Majority opinion finds succor for its view that S.B. 662 was not intended to have any effect on the state agricultural land transfer tax collection and distribution at the local level because, had that not been the case, the Fiscal and Policy Note for S.B. 662 would have addressed surely such a contrary consequence. Maj. Op. at 74-76 and n. 5, 124 A.3d at 199-200 and n. 5. It is true certainly that the Fiscal and Policy Note does not mention that it was expected that the change would result in diminution of the County’s revenue share, regardless of the tandem operation of the tax ceiling. My intuition and experience with State and local government over 45 years of practice (the last 24 of which were as a Judge) suggests, however, that, had the result in the present case been a foreseeable consequence of the revised scheme, the Note would have addressed it and Bloody Hell would have been raised by MACO and any affected constituent jurisdiction. That did not occur. As the Majority opinion implies, MACO embraced SB 662 in 2008. Maj. op. at 75-77, 124 A.3d at 200-01. Of course, everyone back then could have been operating under a misapprehension about the logical extension in actual operation of S.B. 662 within the pre-existing statutory scheme. There is no evidence of that either, however. For that reason, I am persuaded by the absence in the legislative history of SB 662 of any indicia that the imposition of the 25% surcharge, even with the tax ceiling, was intended to be part of the tax rate and, thus, the Majority’s construction in the *80 present case resulted improperly in a refund due to Phillips from the County.
I would answer the certified question sent to us by the Court of Special Appeals “No,” reverse the judgment of the Circuit Court for Montgomery County, and direct remand of the case to the Circuit Court for entry of a judgment affirming the Tax Court’s decision.
Judge GREENE authorizes me to state that he joins the views expressed in this dissent.